UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/25/2019

MICHAEL MOSCATELLO,

                Plaintiff,

    -against-

ANDREW M. SAUL, Commissioner of
Social Security,

              Defendant.

18-CV-1395 (BCM)

**OPINION AND ORDER**

**Barbara Moses, United States Magistrate Judge.**

Plaintiff Michael Moscatello brings this action pursuant to § 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking judicial review of a final determination of the Commissioner of Social Security (the Commissioner) denying his application for Supplemental Security Income (SSI).[1] The parties consented to the disposition of this case by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) (Dkt. No. 20), and cross-moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). (Dkt. Nos. 18, 27.) For the reasons that follow, plaintiff's motion will be granted and the Commissioner's motion will be denied.

## I.    BACKGROUND

### A.    Procedural Background

Plaintiff applied for SSI on April 18, 2014, alleging disability since June 1, 2012, due primarily to neck and back pain, as well as depression and anxiety. *See* Certified Administrative Record (Dkt. No. 9) (hereinafter "R. __") at 161-62. The Social Security Administration (SSA) denied plaintiff's application on August 12, 2014. (R. 172-73.) Plaintiff timely requested a hearing, and on August 5, 2016, he appeared before Administrative Law Judge (ALJ) Mary Withum. (R.

---

[1] Andrew M. Saul, the current Commissioner of Social Security, is substituted in the case caption for Nancy A. Berryhill in accordance with 42 U.S.C. § 405(g) and Fed. R. Civ. P. 25(d). The Clerk of Court is respectfully directed to enter the substitution on the electronic docket.

123.) However, noting that plaintiff's records were "very outdated" (R. 126), ALJ Withum adjourned the hearing in order to develop the record. (R. 128.)

On September 26, 2016, plaintiff appeared before ALJ Beverly Susler Parkhurst. In a written decision dated February 8, 2017 (Decision) (R. 11-20), ALJ Parkhurst found that plaintiff had the residual functional capacity (RFC) to perform light work (R. 15), with certain additional limitations, and determined that he was not disabled within the meaning of the Act. Plaintiff requested review by the Appeals Council, but on December 8, 2017, that request was denied (R. 1-7), rendering the ALJ's determination final.[2]

### B. Personal Background

Plaintiff was born on May 31, 1983, and was 30 years old on the date of his application. (R. 268.) He completed one year of college and has a certificate from the Connecticut School of Broadcasting. (R. 147.) Plaintiff has held various jobs in telemarketing, promotions, and retail sales. (R. 145-46.) However, his last full-time position ended in January 2011, when he was let go from a seasonal job at U.S. Polo Association. Thereafter he "was doing some work on the side," fixing VCRs and computers. (R. 146.) Plaintiff lives with his parents and his brother. (R. 159.)

On June 1, 2012, plaintiff was in a motor vehicle accident in which he was "the seat belted passenger in the front seat of a vehicle" that was "rear ended by a speeding vehicle." (R. 598.) He began having neck and lower back pain shortly after the accident. (R. 313.)

On June 24, 2014, plaintiff submitted a hand-written Function Report stating that he is "unable to do anything, because of [his] severe back pain." (R. 306.) He wrote that he "sometimes

---

[2] Plaintiff submitted additional medical evidence to the Appeals Council, including a psychiatric functional assessment dated May 25, 2017, and a residential functional capacity questionnaire dated May 26, 2017. (R. 97-111.) The Appeals Council explained that since "[t]his additional evidence does not relate to the period at issue," it "does not affect the decision about whether you were disabled beginning on or before February 8, 2017." (R. 2.)

tr[ies] to take short walks," but mostly he stays at home. (R. 306.) He spends his time reading, watching TV, and "computers." (R. 309.) He does not drive, shop, do any household chores or prepare his own meals. (R. 307-09.) He walks with a cane and uses a "back brace for watching T.V." (R. 311-12.) He describes his pain as "[b]asically unchanged" since the accident, but states that "with medication and injections, I manage." (R. 314.) Plaintiff states that he takes Percocet and "Flexerall" for his pain. (*Id*.)[3]

Plaintiff also reports that he was diagnosed with depression at the age of 18 and began suffering panic attacks at the age of 22. (R. 315.) He states that anything can trigger his panic attacks, which cause "heart palpitations, irregular heart beat [and] pounding in the chest and head." (*Id*.) Plaintiff reports that he takes Klonopin, Lexapro, and Wellbutrin. (*Id*.)[4]

## II.   PLAINTIFF'S MEDICAL HISTORY

The parties have presented summaries of the medical evidence in their briefs. *See* Pl. Mem. (Dkt. No. 19) at 3-13; Def. Mem. (Dkt. No. 28) at 2-10. Because the summaries are consistent in all material respects, the Court hereby adopts them, and highlights only those facts relevant to the Court's decision.

---

[3] Percocet is a pain reliever that contain a combination of oxycodone (opioid) and acetaminophen. *Percocet*, WebMD, https://www.webmd.com/drugs/2/search?type=drugs&query=percocet (last visited Sept. 25 2019). Flexeril (cyclobenzaprine) is a muscle relaxer that is generally used short-term to treat muscle spasms. *Flexeril*, WebMD, https://www.webmd.com/drugs/2/drug-11372/flexeril-oral/details (last visited Sept. 25, 2019).

[4] Klonopin (clonazepam) is a benzodiazepine used to treat panic attacks, among other conditions. *Klonopin*, WebMd, https://www.webmd.com/drugs/2/drug-920-6006/klonopin-oral/clonazepam-oral/details (last visited Sept. 25, 2019). Lexapro (escitalopram) is a selective serotonin reuptake inhibitor (SSRI) used to treat depression and anxiety. *Lexapro*, WedMd, https://www.webmd.com/drugs/2/search?type=drugs&query=lexapro (last visited Sept. 25, 2019). Wellbutrin (bupropion) is a non-SSRI anti-depressant. *Wellbutrin*, WedMd, https://www.webmd.com/drugs/2/drug-13509-155/wellbutrin/details (lasted visited Sept. 25, 2019).

### A. Treatment Records

#### 1. Dr. Peter Kwan

In July 2012 Dr. Kwan, a neurologist, referred plaintiff for an MRI of his cervical and lumbosacral spine. (R. 660-61.) The MRI of the cervical spine revealed "a right foraminal herniation with impingement on the existing C5 root" at C4-5, and "a right foraminal herniation with impingement on the existing C6 root" at C5-6. (R. 660.) The MRI of the lumbosacral spine revealed "a bulging disc, without stenosis" at L3-4, "a bulging disc with mild canal and moderate bilateral foraminal stenosis" at L4-5, and "a central herniation with thecal sac indentation" at L5-S1, but "no canal or foraminal stenosis." (R. 661.)

Dr. Kwan saw plaintiff again in early 2013. (R. 656-59.) Dr. Kwan's notes from this visit document tenderness and restricted range of motion in both the cervical and lumber spine, bilateral positive straight leg raising tests, and sensory loss (light touch and pinprick) involving the right C6-7 dermatomes. (R. 656, 658.) Dr. Kwan recommended that plaintiff continue treatment with Dr. Robert Marini (discussed below) and continue physical therapy. (R. 657.) In addition, Dr. Kwan prescribed Vicodin on January 4, 2013, and Percocet on February 1, 2013. (R. 657, 659.) [5] He opined on both visits that plaintiff "is still considered **totally** disabled at this time." (R. 657, 659) (emphasis in original).

#### 2. Dr. Robert Marini and Dr. Felix Almentero

Dr. Marini and Dr. Almentero are pain management specialists, board-certified in physical medicine and rehabilitation, who treated plaintiff from August 2012 through December 2014. (R. 356, 630, 637.) In February 2014, they performed upper extremity and lower extremity EMG/nerve

---

[5] Vicodin is a pain reliever that combines hydrocodone (opioid) and acetaminophen. *Vicodin*, WebMD, https://www.webmd.com/drugs/2/drug-3459/vicodin-oral/details (last visited Sept. 25 2019).

conduction examinations on plaintiff (R. 628-42), which found no evidence of cervical radiculopathy, neuropathy or myopathy (R. 629), but it did find "right L4 L5 radiculopathies." (R. 637.) Most of the remaining treatment notes in the record belong to Dr. Almentero, who saw plaintiff monthly from January through July 2014. (R. 598-627.)[6] Dr. Almentero diagnosed plaintiff with "cervicalgia," "cervical disc prolapse with radiculopathy," "lumbar disc hernitation with radiculopathy," lumbago," and "myofascial pain" (R. 601, 606, 611), and prescribed various narcotics as well as trigger point injections in the lower back. (R. 611, 615, 624-25.) Dr. Almentero repeatedly opined in his notes that plaintiff was "unable to do any work" and was "partially disabled," but that he was "independent with self-care," "able to get up and walk independently," and "able to lift up to 20 lbs occasionally." (R. 599-600, 604-05, 614, 619.)

### 3. Dr. Fenar Themistocle

Plaintiff began treating with anesthesiologist and pain management specialist Dr. Themistocle in March 2016. (R. 679.) Dr. Themistocle administered selective nerve blocks at L3, L4, and L5 (R. 665, 672), as well as a cervical epidural steroid injection and trigger point injection. (R. 676.) He prescribed Percocet, Neurontin, and Cyclobenzaprine,[7] referred plaintiff to physical therapy, recommended an "exercise regimen" and "activity as tolerated," and warned plaintiff to "avoid heavy lifting." (R. 666, 670-71, 674, 681.) A June 2014 nerve conduction study found "mild acute right C5 radiculopathy," but otherwise "no evidence of electrical instability." (R. 684.)

---

[6] Although these were the only treatment notes submitted to the SSA, Dr. Almentero references a "prescription monitoring program" dating back to September 26, 2013 and cervical epidurals and selective nerve root block injections to the right L4-L5 from September through November 2012. (R. 599-600.) It thus appears that the SSA did not obtain a full set of records from Dr. Almentero.

[7] Neurontin (gabapentin) is an anticonvulsant or antiepileptic drug that is used to prevent and control seizures and help with nerve pain. *Gabapentin*, WebMD, https://www.webmd.com/ drugs/2/drug-14208-8217/gabapentin-oral/gabapentin---oral/details (last visited Sept. 25, 2019).

### 4. FEGS

Plaintiff received regular "wellness care" check-ups from July 2013 through April 2014 through Federation Employment & Guidance Service (FEGS), where he was treated by several doctors and social workers (R. 374-551), including Dr. Jee Lee, an internist at Bronx Lebanon Hospital, who performed a physical and mental evaluation of the plaintiff on July 17, 2013 (discussed below). During his FEGS visits, Plaintiff reported a history of panic attacks, as well as persistent neck, shoulder, and back pain. (R. 395, 415, 423, 500, 567, 579.)[8]

### 5. Dr. Luis Gonzales

Plaintiff treated with Dr. Gonzales, a psychiatrist, from July 2015 through the date of his hearing in September 2016. (R. 356.) There are no treatment notes from Dr. Gonzales in the administrative record. However, in September 2016, Dr. Gonzales completed a "Medical Report" and a "Medical Source Statement" (discussed below). (R. 688, 692.) Dr. Gonzales diagnosed plaintiff with "generalized anxiety disorder with frequent panic attacks, mild agoraphobic avoidance, [and] frequent obsessive thoughts," and prescribed Klonopin and Ambien to manage plaintiff's anxiety and insomnia. (R. 688.)[9]

---

[8] Various FEGS notes list a "Dr. Miah" as plaintiff's treating psychiatrist. (R. 400, 576.) There are no treating records or evaluations from Dr. Miah in the administrative record. Instead, the record shows that the SSA twice requested records from Dr. Miah, as required by 20 C.F.R. § 416.912(d)(1) (2015), but received no response. (R. 39, 112.)

[9] Ambien (Zolpidem) belongs to a class of drugs called sedative-hypnotics. "It acts on your brain to produce a calming effect and is used to treat insomnia in adults." *Ambien*, WebMD, https://www.webmd.com/drugs/2/drug-9690-8110/ambien/details (last visited Sept. 25, 2019).

### B. Opinion Evidence

#### 1. Dr. Lee

On July 17, 2013, Dr. Lee and FEGS social worker Nancy Stremmel completed a "Biopsychosocial Summary" of plaintiff's medical needs as part of a FEGS "Wellness Care Plan." (R. 440-493.) In summary, Ms. Stremmel notes that plaintiff reported "long standing panic attacks" which "prevented him from being on public transportation," as well as "pain [that] prevents him from standing or sitting too long or doing physical work." (R. 448.) Plaintiff also reported that his daily medications included Clonazepam, Percocet, Tizanidine, and Meloxicam. (R. 450-51).[10]

Dr. Lee noted that plaintiff had mild pain in his left shoulder and severe pain in his neck (R. 482), and diagnosed him with "other and unspecified disorder of joint" and "panic disorder without agoraphobia." (R. 491.) Dr. Lee found no exertional or non-exertional limitations that would prevent plaintiff from working. (R. 483-88.) However, she opined that plaintiff had "unstable medical and/or mental health conditions that require treatment (a wellness plan) before a functional capacity outcome can be made." (R. 492.)

#### 2. Dr. Marini

On March 5, 2014, Dr. Marini completed a "Treating Physician's Wellness Plan Report," for purposes of a local public assistance program, in which he opined that the "patient is unable to work due to his condition and will be unable to work for at least 12 months." (R. 379-82.) The Wellness Plan Report did not provide a function-by-function evaluation. Dr. Marini also

---

[10] Tizanidine is a muscle relaxer used to treat muscle spasms caused by certain conditions (such as multiple sclerosis, spinal cord injury). *Tizanidine*, WebMD, https://www.webmd.com/drugs/2/drug-1024-6105/tizanidine-hcl/details (last visited Sept. 25, 2019). Meloxicam is a nonsteroidal anti-inflammatory drug (NSAID) that "reduces pain, swelling and stiffness of the joints." *Meloxicam*, WebMD, https://www.webmd.com/drugs/2/drug-911/meloxicam-oral/details (last visited Sept. 25, 2019).

completed a "Multiple Impairment Questionnaire" on June 16, 2014, in which he opined that plaintiff could sit for two hours in an eight-hour day, could stand or walk for 1-2 hours in an eight-hour day, but could not sit, walk, or stand "continuously" in a work setting. (R. 592-93.) He further opined that plaintiff could occasionally lift or carry less than 10 pounds but never more than 10 pounds (R. 593); that he would have significant limitations in repetitive reaching, handling, fingering, or lifting (*id.*); that he could tolerate only low stress work (R. 595); and would likely be absent from work more than three times a month. (*Id.*)

### 3.    Dr. Sharon Revan

On July 24, 2014, Dr. Revan, an internist, examined plaintiff at the request of the SSA. (R. 648-654.) Dr. Revan observed that he "appeared to be in no acute distress. Gait normal. Unable to walk on heels and toes. Squats halfway holding on. Stance normal. Used no assistive devices." (R. 648.) She found some limited range of motion in the spine, and positive straight leg raising tests bilaterally. (R. 650.) She opined that plaintiff had "mild to moderate limitations with upper extremities for gross motor activity . . . mild limitations with walking . . . sitting, standing and lying down . . . [and] moderate limitations in activities of daily living secondary to neck and back pain." (R. 651.)

### 4.    David Mahony, Ph.D.

Also on July 24, 2014, Dr. Mahony, a clinical psychologist, evaluated plaintiff at the request of the SSA. (R. 643-46.) Dr. Mahony described plaintiff's mood and affect as "anxious" (R. 644), but found that his judgment and insight were "good," his attention, concentration, and memory were "intact," and his cognitive functioning was "average." (*Id.*) Dr. Mahony opined that plaintiff "has no limitations following and understanding simple directions and instructions, performing simple tasks independently, maintaining attention and concentration, maintaining a

regular schedule, learning new tasks, performing complex tasks independently, and making appropriate decisions." (R. 645.) However, Dr. Mahony found that plaintiff had "marked" limitations "relating to others and dealing with stress," due to anxiety. (*Id.*)

### 5. S. Juriga, Ph.D.

On August 11, 2014, state agency examiner Dr. Juriga evaluated plaintiff's records, to the extent then obtained by the SSA (including Dr. Mahony's report), and on that basis performed a "Mental Residual Functional Capacity Assessment" for plaintiff's initial benefits application. (R. 167.) Dr. Juriga concluded that plaintiff had "moderate" difficulties in maintaining social functioning and "mild" difficulties maintaining concentration, persistence and pace. (R. 166.) She further opined that his ability to "interact appropriately with the general public," "get along with co-workers," and "work[ ] in coordination with or in proximity to others without being distracted by them" was only "moderately limited." (R. 169-70.)

### 6. Dr. Gonzales

Dr. Gonzales, plaintiff's treating psychiatrist, completed a "Medical Source Statement" on September 21, 2016, days before plaintiff's hearing before ALJ Parkhurst. (R. 692-94.) Dr. Gonzales assessed "moderate" limitations in plaintiff's ability to understand, remember and carry out simple instructions, and "marked" limitations in his ability to "interact appropriately with supervision, co-workers, and the public, as well as respond to changes in the routine work setting." (R. 693.)

### 7. Dr. Themistocle

On September 22, 2016, Dr. Themistocle completed a "General Medical Report" and a "Medical Source Statement." (R. 695-703.) He listed plaintiff's diagnoses as lumbosacral spondylosis, lumbar disc displacement, and cervical radiculopathy, and opined that plaintiff is

"unable to do any substantial gainful work activity." (R. 695-96.) He further opined that plaintiff

could lift and carry up to 10 pounds occasionally, but could never lift or carry more than 10 pounds

(R. 698); that plaintiff could sit, stand, or walk for no more than 25 minutes at a time, and no more

than 25 minutes in an eight-hour day (R. 699); that plaintiff required a cane to walk (*id*.); and that

he could occasionally perform postural activities such as climbing stairs and ramps, climbing

ladders, balancing, stooping, kneeling, crouching, or crawling. (R. 701.) He also opined that

plaintiff could shop, travel without a companion, walk a block at a reasonable pace on rough or

uneven surfaces, use standard public transportation, climb a few steps at a reasonable pace with

use of a handrail, prepare simple meals, and take care of his personal hygiene. (R. 703.)

## III.    HEARING

On September 26, 2016, plaintiff and his non-attorney representative, Pauline Asemota,[11]

appeared by video before ALJ Beverly Susler Parkhurst, who was in Chicago. (R. 140.) Vocational

Expert (VE) Michelle Peters-Pagella testified by telephone. (R. 141.)

At the beginning of the hearing, plaintiff's representative reported that plaintiff had

submitted additional medical records (from Dr. Gonzales and Dr. Themistocle) that, "in [her]

opinion, will bring the case up to date." (R. 142.) In response to questions from the ALJ, Ms.

Asemota confirmed that the file was complete and the case was "ready to go." (R. 141, 143.)

### A.    Plaintiff's Testimony

Plaintiff appeared at the hearing with a cane. (R. 158.) He testified that since the car

accident in June 2012, he had "been unable to do the things that [he] was able to do in the past."

(R. 144.) He explained that he "can't shop on [his] own anymore, it's tough for [him] to walk, [he

---

[11] The hearing transcript incorrectly lists plaintiff's representative as Pauline "Esmolde" (R. 140) rather than Pauline Asemota. (*See* R. 262.) The Decision erroneously lists plaintiff's representative as "Jerrey Adler." (R. 11.)

has] numbing and – tingling going down [his] extremies due to herniated and bulging discs in [his] back [and neck], and [he] has nerve damage." (R. 144.) Plaintiff also testified that he "suffer[s] panic attacks . . . around large groups of people" that make him "feel like [he is] going to [have] a heart attack." (*Id*.)

Plaintiff confirmed that he was laid off from a seasonal retail job in January 2011. (R. 146.) After that, he worked for himself, repairing VCRs and computers, but "that required a lot of heavy lifting and a lot of stuff that after the accident, I just – I haven't been able to do anything, my back gives out, my – my body is just in terrible shape." (*Id*.) Plaintiff testified that he was living with his family and received "assistance from the government." (R. 147, 159.) He reported that he relied on his father to drive him places. (R. 158.) He explained, "I cannot take any public transportation because if I am even sitting on those hard seats on the bus or on the train for more than three minutes, my back just literally feels like it is going to crack." (*Id*.)

The ALJ asked plaintiff if he had tried to work in the broadcasting field after receiving his certificate from the Connecticut School of Broadcasting. (R. 147.) Plaintiff responded that "that was really what [he] wanted to be" and he had been "putting [his] resume out to different places, different networks, different radio stations locally" (*id*.), but that after the accident "it had to take a backseat because . . . [he] was no longer the way [he] used to be." (*Id*.)

Plaintiff also testified as to his medical treatment. He had been "getting epidurals" every six months for the past four years. (R. 148.) Recently, he had "gotten two in [his] neck and two in his back," which "help for a couple of days at a time and then it kind of goes away." (*Id*.) He said that his doctors told him that he might need spinal surgery, and that surgery might be "the only kind of route for [him] to get back to being well." (R. 148-49.) He stated that the medication he was taking did not cause many side effects, other than making him "a little groggy." (R. 149.)

Turning to his mental health, plaintiff testified that his panic attacks began at age 22 and got "worse and worse." (R. 149.) However, since he started seeing Dr. Gonzales, in September 2015, plaintiff's panic attacks were "under control," and "[n]ow . . . as long as I take the medication, it's only really bad at night." (R. 149-50.)

**B.  The VE's Testimony**

After hearing from plaintiff, the ALJ asked VE Peters-Pagella a series of questions about hypothetical claimants with plaintiff's age, education, and work history. The first hypothetical claimant could perform "medium" work, as defined in the SSA's regulation, with only occasional (up to 1/3 of the work day) twisting, climbing, balancing, stooping, crawling, crouching and kneeling.[12] Such a claimant, according to the VE, could perform plaintiff's past relevant work. (R. 155.) If that claimant were capable only of simple, routine, and repetitive tasks, and could only occasionally interact with the general public, superficially, he would not be able to perform plaintiff's past jobs; however, according to VE Peters-Pagella, there were other jobs in the national economy that such a claimant could perform, including dishwasher (DOT 318.687-010), with 450,000 positions in the national economy, and sorter (DOT 929.687-022), with 385,000 positions in the national economy. (R. 155-56.)

The next hypothetical claimant could perform "light" work, with the same postural limitations. (R. 156.) The VE testified that such a claimant – without any mental limitations – could perform plaintiff's past relevant work. (*Id*.) "[W]ith the limitations," the claimant could not perform plaintiff's past jobs but could work in "assembly" (DOT 701.687-010), with 380,000

---

[12] Although the Court is relatively certain that this is what the ALJ meant, the question was communicated to the VE using a form of shorthand that was likely difficult, if not impossible, for plaintiff to understand: "I give you medium . . . that would be 50 and 25 on lifting, standing six out of eight, walking the same. Let's say occasional on posturals up to a third of the day, make it easy." (R. 153.) The ALJ's other hypothetical questions were similarly phrased. (R. 154-56.)

positions in the national economy, or hold a "hand packaging position[]" (DOT 559.687-074), with 400,000 positions available nationwide. (*Id.*)

The final hypothetical claimant was limited to "sedentary" work, with the same postural limitations. According to VE Peters-Pagella, such a claimant could perform plaintiff's past work in telemarketing. (R. 156.) "With the mental limitations," that claimant could not work as a telemarketer but could hold "unskilled sedentary assembly positions" (DOT 734.687-018), with approximately 185,000 positions in the national economy, and "hand packager positions, unskilled sedentary" (DOT 715.684-026), with 190,000 positions available nationally. (R. 156-57.)

The VE testified that most of these jobs would allow, on average, absences of one and a half days each month, and would further allow an employee to be off-task up to 15% of a work day. (R. 157.)

## IV.    ALJ DECISION

### A.    Standards

A claimant is "disabled," within the meaning of the Act, when he is "unable to engage in any substantial gainful activity [SGA] by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *accord* 20 C.F.R. §§ 416.905(a), 416.909.

In order to determine whether an SSI claimant over the age of 18 is disabled within the meaning of Act, the Commissioner is required to apply a five-step evaluation process pursuant to 20 C.F.R. § 416.920(a)(4). In order, the steps are:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity"

assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's [RFC], age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014); *accord Jasinski v. Barnhart*, 341 F.3d 182, 183-84 (2d Cir. 2003). The claimant's RFC, which is "the most [he] can still do despite [his] limitations," 20 C.F.R. § 416.945(a)(1), must be assessed "based on all the relevant medical and other evidence in [his] case record," 20 C.F.R. § 416.920(e); *accord* 20 C.F.R. § 416.945(a)(1), (a)(3).

If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. § 416.920(a)(4). The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at the fifth step to show "that other work exists in significant numbers in the national economy that [the claimant] can do, given [his] residual functional capacity, . . . age, education, and work experience." 20 C.F.R. §§ 416.912(b)(3) (2015), 416.960(c)(2).[13]

### B.  Application of Standards

At step one, ALJ Parkhurst found that plaintiff had "not engaged in substantial gainful activity since April 18, 2014, the application date." (R. 13.)

At step two, the ALJ found that plaintiff had two severe impairments: "degenerative disc disease of the lumbar and cervical spine" and "anxiety disorder." (R. 13.)

At step three, the ALJ found that plaintiff did not have "an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR

---

[13] 20 C.F.R. § 416.912 was amended effective March 27, 2017. In this Opinion and Order, I quote and apply the regulations as they existed at the time of the Decision. Citations to regulations that have since been amended include the date of the version that was in effect at that time.

Part 404, Subpart P, Appendix 1." (R. 13.) She considered Listing 1.04 (disorders of the spine), but found that plaintiff's impairments did not meet that Listing because his degenerative disc disease did not "result[] in compromise of a nerve root or the spinal cord with: evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication manifested by chronic nonradicular pain and weakness." (R. 14.)

The ALJ then found that plaintiff's mental impairment did not meet or medically equal "the criteria of any impairment listed in section 12.00" (mental disorders), because plaintiff did not satisfy either the "paragraph B criteria" or the "paragraph C criteria." (R. 14.)[14] With regard to paragraph B, the ALJ found that plaintiff had "mild" limitations in understanding, remembering, or applying information, "moderate" limitations in interacting with others, "mild" limitations with regard to concentrating, persisting, or maintaining pace, and "mild" limitations in adapting or managing himself. (*Id.*) With regard to paragraph C, the ALJ found that plaintiff did not require treatment in a highly structured setting and had more than a minimal capacity to adapt to change. (R. 15.)

---

[14] All of the potentially relevant mental disorder Listings, including Listing 12.06 (anxiety and obsessive-compulsive disorders), require that the disorder satisfy the requirements of either paragraph B or paragraph C. *See* 20 C.F.R. pt. 404, subpt. P, app'x 1 § 12.00(A) (2016). To satisfy the paragraph B criteria, the mental disorder must result in "[e]xtreme limitation of one, or marked limitation of two" of the four areas of mental functioning, which are: (1) the ability to "understand, remember, or apply information"; (2) the ability to "interact with others"; (3) the ability to "concentrate, persist, or maintain pace"; and (4) the ability to "adapt or manage oneself." *Id.* § 12.06(B). To satisfy the paragraph C criteria, the mental disorder must be "serious and persistent," and there must be evidence of both: (1) "[m]edical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder" and (2) "[m]arginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life." *Id.* § 12.06(C).

Before proceeding to step four, the ALJ determined plaintiff's RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b), meaning that the claimant is capable of lifting or carrying 20 pounds occasionally, lifting or carrying 10 pounds frequently, sitting for 6 hours in an 8-hour workday, and standing or walking 6 hours in an 8-hour workday. The claimant is capable of twisting, climbing, balancing, stooping, crawling, crouching and kneeling for up to 1/3 of the day. The claimant is capable of simple, routine and repetitive tasks and interacting with the general public superficially for up to 1/3 of the day.

(R. 15.)[15]

In determining plaintiff's RFC, the ALJ found that plaintiff's "medically determinable impairments could reasonably be expected to produce [his] alleged symptoms," but that the plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 17.)

With regard to plaintiff's physical limitations, the ALJ noted that although "imaging of his cervical and lumbar spine shows moderate degenerative disc disease," the "most recent EMG testing shows only mild radiculopathy." (R. 17.) Additionally, although plaintiff "exhibits tenderness," a "limited range of motion," "spasms," and "an antalgic gait," his "physicians continue to recommend conservative treatment" and their treatment notes "restrict him only in heavy lifting." (*Id.*) The ALJ gave Dr. Marini's June 2014 opinion "little" weight, reasoning that "the treatment provided and the clinical findings are inconsistent with [his] assessment that the [plaintiff] has

---

[15] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 416.967(b).

severe limitations." (R. 18.) She gave no weight at all to Dr. Themistocle's opinion, completed in September 2016, finding it inconsistent with "the treatment notes" as well as "inherently inconsistent." (*Id*.) She did not discuss the opinion of consultative internist Dr. Revan.

In determining plaintiff's mental limitations, the ALJ gave "great" weight to the State agency reviewer's assessment, without explanation; "partial" weight to the consultative examiner's opinion, because plaintiff testified that he has "experienced improvement"; and "little" weight to the opinion of Dr. Gonzales, plaintiff's treating psychiatrist, because plaintiff "has not had panic attacks since 2015" and "there is no evidence supporting marked limitations in his ability to interact with co-workers, supervisors and the general public superficially." (R. 18.)

At step four, the ALJ found that plaintiff is "unable to perform any past relevant work." (R. 19.)

At step five, the ALJ determined that, given the plaintiff's age, education, work experience, and RFC, "there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform." (R. 19.)

## V.    ANALYSIS

### A.    Standard of Review

The Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The reviewing court may set aside a decision of the Commissioner only if it is "based on legal error or if it is not supported by substantial evidence." *Geertgens v. Colvin*, 2014 WL 4809944, at *1 (S.D.N.Y. Sept. 24, 2014) (quoting *Hahn v. Astrue*, 2009 WL 1490775, at *6 (S.D.N.Y. May 27, 2009)); *accord Longbardi v. Astrue*, 2009 WL 50140, at *21 (S.D.N.Y. Jan. 7, 2009). Thus, where an applicant challenges the agency's decision, the district court must first decide whether the Commissioner applied the

correct legal standards. *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Calvello v. Barnhart*, 2008 WL 4452359, at *8 (S.D.N.Y. Apr. 29, 2008). If there was no legal error, the court must determine whether the ALJ's decision was supported by substantial evidence. *Tejada*, 167 F.3d at 773; *Calvello*, 2008 WL 4452359, at *8.

"Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1970)). However, the reviewing court's task is limited to determining whether substantial evidence exists to support the ALJ's fact-finding; it may not reweigh that evidence or substitute its judgment for that of the ALJ where the evidence is susceptible of more than one interpretation. "[O]nce an ALJ finds facts, [the court] can reject those facts only if a reasonable factfinder would *have to conclude otherwise.*" *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (quotation marks and citation omitted). As long as the ALJ's decision is supported by substantial evidence, therefore, "the Court must affirm the decision of the [Commissioner] even if there is also substantial evidence for plaintiff's position." *Gernavage v. Shalala*, 882 F. Supp. 1413, 1417 n.2 (S.D.N.Y. 1995) (citing *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)); *accord Johnson v. Astrue*, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008).

Although the substantial evidence standard is "a very deferential standard of review – even more so than the 'clearly erroneous' standard," *Brault*, 683 F.3d at 448; *see also Brown v. Colvin*, 73 F. Supp. 3d 193, 198 (S.D.N.Y. 2014), "the crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence." *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984). Thus, remand may be appropriate if the ALJ fails to provide an adequate "roadmap" for his reasoning.

But if the ALJ adequately explains his reasoning, and if his conclusion is supported by substantial evidence, the district court may not reverse or remand simply because it would have come to a different decision on a *de novo* review. "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotation marks omitted). *See also Ryan v. Astrue*, 5 F. Supp. 3d 493, 502 (S.D.N.Y. 2014) (quoting *Beres v. Chater*, 1996 WL 1088924, at *5 (E.D.N.Y. May 22, 1996)) ("[T]his Court may not substitute its own judgment as to the facts, even if a different result could have been justifiably reached upon *de novo* review.").

### B.     The Parties' Contentions

Plaintiff seeks remand on four principal grounds. First, plaintiff asserts that the ALJ erred by failing to adequately develop the record. Pl. Mem. at 14-16. Second, plaintiff contends that he should have been found disabled at step three because his back impairment meets or equals the requirements of Listing 1.04, and because his mental impairment meets or equals the requirements of Listing 12.06. *Id*. at 18-21. Plaintiff also argues that the ALJ did not provide an adequate roadmap for her reasoning regarding Listing 1.04. *Id*. at 21. Finally, plaintiff asserts that the ALJ did not "afford sufficient weight" to the opinion of his treating psychiatrist, Dr. Gonzales. *Id*. at 23.

In response, the Commissioner argues generally that the ALJ's decision was free from legal error and supported by substantial evidence, including the opinions of the consultative examiners and the contemporaneous treatment notes of plaintiff's physicians. Def. Mem. at 14-16. According to the Commissioner, the ALJ was not required to defer to the opinion of Dr. Gonzales because it was inconsistent with "his generally normal mental status findings," and was contradicted by the

opinions of non-examining reviewer Dr. Juriga and FEGS physician Dr. Lee. *Id*. at 19. The Commissioner also contends that plaintiff's impairments did not meet or equal any Listing at step three, *id*. at 19-22, and that the ALJ adequately developed the record. *Id*. at 23-24.

The Court agrees with the Commissioner, substantially for the reasons set forth in his brief, that the ALJ did not err at step three, and adequately developed the record. However, the ALJ improperly weighed the medical opinion evidence when, without providing adequate support for her reasoning, she rejected or steeply discounted the views of all of plaintiff's treating physicians, wholly ignored the opinion of the consultative internist, and – with regard to plaintiff's mental impairments – gave "great weight" to the out-of-date opinion of a non-examining state agency reviewer. As a result, the record lacks substantial evidence to support the ALJ's finding as to plaintiff's RFC or her ultimate conclusion that he was not disabled. Remand is therefore required.

### C.     The ALJ Improperly Weighed the Medical Opinion Evidence

### 1.     The Treating Physician Rule and Related Regulations

The regulations governing plaintiff's application for benefits required the ALJ to give controlling weight to the opinions of his treating physicians so long as those opinions were well-supported by medically acceptable clinical and laboratory diagnostic techniques and were not inconsistent with other evidence in the record. 20 C.F.R. § 416.927(c)(2) (2012). A treating physician is the claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [him], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [him]." 20 C.F.R. § 416.902 (2011). The rule recognizes that a treating physician is "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual

examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 416.927(c)(2) (2012); *see also Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place him in a unique position to make a complete and accurate diagnosis of his patient.").

Where mental health treatment is at issue, the "longitudinal picture" takes on added significance. *Rodriguez v. Astrue*, 2009 WL 637154, at *26 (S.D.N.Y. Mar. 9, 2009). "A mental health patient may have good days and bad days; she may respond to different stressors that are not always active. Thus, the longitudinal relationship between a mental health patient and her treating physician provides the physician with a rich and nuanced understanding of the patient's health that cannot be readily achieved by a single consultative examination." *Bodden v. Colvin*, 2015 WL 8757129, at *9 (S.D.N.Y. Dec. 14, 2015); *accord Ramos v. Comm'r of Soc. Sec.*, 2015 WL 708546, at *15 (S.D.N.Y. Feb. 4, 2015).

Under the applicable regulations, if the ALJ did not assign controlling weight to the opinion of a treating physician, she was required to give "good reasons" for failing to do so, and "comprehensively set forth [the] reasons for the weight assigned" to the opinion. *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (quoting *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)); *see also* 20 C.F.R. § 416.927(c)(2) (2012) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's medical opinion."). In particular, the ALJ was required to "explicitly consider . . . (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (citing *Burgess*, 537 F.3d at 129); *see also* 20

C.F.R. § 416.927(c)(2)(i)-(ii) (2012) (ALJ must consider length of treatment relationship, frequency of examination, and how much "knowledge a treating source has about your impairment(s)"). "[F]ailure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Greek*, 802 F.3d at 375; *see also Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 (2d Cir. 2010) ("We do not hesitate to remand when the Commissioner has not given good reasons for the weight given to a treating physician's opinion.").

Even where a treating physician's opinion did not warrant controlling weight, the ALJ was "generally" required to weigh that opinion more heavily than the opinion of a consultative examiner, which in turn was entitled to more weight than the opinion of a non-examining medical source. 20 C.F.R. § 416.927(c)(1)-(2) (2012); *see also Selian*, 708 F.3d at 419 ("ALJs should not rely heavily on the findings of consultative physicians after a single examination."); *Ridge v. Berryhill*, 294 F. Supp. 3d 33, 61 (E.D.N.Y. 2018) (quoting *Vargas v. Sullivan*, 898 F.2d 293, 295-96 (2d Cir. 1990)) ("The general rule is that the written reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability. The advisers' assessment of what other doctors find is hardly a basis for competent evaluation without a personal examination of the claimant.") (internal quotation marks omitted).

The applicable regulations expressly required the ALJ to consider and evaluate "every medical opinion" received, "[r]egardless of its source." 20 C.F.R. § 416.927(c) (2012). Thus, she was required to "explain in [her] decision the weight given to the opinions of a State agency medical or psychological consultant," using the same factors that apply to "opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for [the SSA]." 20 C.F.R. § 416.927(e)(2)(ii) (2012).

## 2. Application of Rules

### a. Drs. Gonzales, Mahony, and Juriga

In determining plaintiff's mental RFC, the ALJ assigned "little" weight to the opinion of his treating psychiatrist, Dr. Gonzales (who opined in September 2016 that plaintiff had "moderate" limitations in his ability to understand, remember and carry out simple instructions and "marked" limitations in his ability to "interact appropriately with supervision, co-workers, and the public" and "respond to changes in the routine work setting"); "partial" weight to the views of the consultative psychologist, Dr. Mahony (who opined in July 2014 that plaintiff had "marked" limitations "relating to others and dealing with stress"); and "great" weight to the opinion of the state agency reviewer, Dr. Juriga (who opined in August 2014, after reading Dr. Mahony's report, that plaintiff was only "moderately limited" in his ability to "interact appropriately with the general public," "get along with co-workers," and "work[] in coordination with or in proximity to others without being distracted by them"). (R. 18.)

The ALJ discounted Dr. Gonzales's opinion because "the claimant's mental status examination is primarily normal, besides anxiety," and because "claimant report[ed] improvement" in his anxiety under Dr. Gonzales's care, testifying that "his medications now control his symptoms" and that he has "not had panic attacks since 2015." (R. 18.) She reasoned that while plaintiff "has difficulty in larger crowds . . . there is no evidence supporting marked limitations in his ability to interact with co-workers, supervisors and the general public superficially." (*Id.*)

Although the ALJ did not articulate the required regulatory factors with the clarity contemplated by 20 C.F.R. § 416.927(c)(1)-(6) (2012), her decision to afford Dr. Gonzales's opinion less than controlling weight would not, standing alone, require remand. Dr. Gonzales's

conclusions were somewhat inconsistent with plaintiff's testimony about his improving symptoms and lack of recent panic attacks, and were also inconsistent with portions of the psychiatrist's underlying findings. For example, in his Medical Report, Dr. Gonzales stated that plaintiff's attention, concentration, and memory were "good" (R. 689), but in his Medical Source Statement, written the same day, he opined that plaintiff had "trouble concentrating, severe at times, [and] remembering instructions, due to [diagnosis] of anxiety, depression, and panic attacks." (R. 692.)

However, the ALJ erred in stating that there was "no evidence" supporting marked limitations on plaintiff's ability to interact with co-workers, supervisors, and the general public. There was indeed such evidence, both from Dr. Gonzales and from Dr. Mahony, who opined, after examining plaintiff, that "[h]e has marked limitations relating to others and dealing with stress." (R. 645.) The ALJ further erred in giving Dr. Mahony's views only "partial" weight, while giving "great weight" to those of the state agency reviewer, Dr. Juriga, who concluded that plaintiff's difficulties with social functioning were only "moderate." (R. 18.)

Both Dr. Mahony and Dr. Juriga had doctoral degrees in psychology. Both rendered their opinions in 2014, two years before the hearing (and before plaintiff began treating with Dr. Gonzales, whom he credited with helping him bring his panic attacks under control with medication). (R. 149-50.) However, Dr. Mahony personally examined plaintiff and administered a mental status exam, whereas Dr. Juriga performed a paper review, consisting largely of reading Dr. Mahony's report. (R. 170.) On these facts, the ALJ's award of "great weight" to Dr. Juriga's opinion "raises significant issues." *Marcano v. Berryhill*, 2018 WL 2316340, at *8, *25 (S.D.N.Y. Apr. 30, 2018) (remanding where ALJ gave "considerable" weight to the opinion of a non-examining state medical consultant who "did not examine Plaintiff and rendered the opinion prior to the receipt of additional medical evidence") (internal quotation marks omitted). *See also*

*Maldonado v. Comm'r of Soc. Sec.*, 2014 WL 537564, at *16 (E.D.N.Y. Feb. 10, 2014) (quoting *Fofana v. Astrue*, 2011 WL 4987649, at *20 (S.D.N.Y. Aug. 9, 2011)) (in the absence of a controlling opinion from a treating physician, the ALJ should have given greater weight to the opinion of the consulting examiner than to the opinion of a non-examining review psychologist who "relied solely on the medical records in the administrative record to form her opinion"); *Fofana*, 2011 WL 4987649, at *20 (quoting *Hernandez v. Astrue*, 2011 WL 1630847, at *10 (E.D.N.Y. Apr. 29, 2011)) ("While it is true that the opinion of a consultative physician 'should not be accorded the same weight as the opinion of [a] plaintiff's treating psychotherapist,' it should certainly be given more weight than that of a non-examining, non-treating source who merely conducts a paper review.") (internal citation omitted), *report and recommendation adopted*, 2011 WL 5022817 (S.D.N.Y. Oct. 19, 2011).

In her Decision, the ALJ discussed the opinions of Drs. Mahony and Juriga in a single paragraph (R. 18), explaining that she gave greater credit to the state agency reviewer than to the consultative examiner because "the claimant has experienced improvement" and testified that his panic attacks decreased with his "new treatment." *Id*. As noted above, however, both psychologists rendered their opinions before that new treatment even began – which could be grounds to discount both of their opinions equally, but could not be a "good reason" for discounting Dr. Mahony's opinion while crediting Dr. Juriga's. The ALJ's decision to do just that therefore "appears arbitrary or is based on error." *Sierra v. Comm'r of Soc. Sec.*, 2018 WL 7681060, at *23 (S.D.N.Y. Dec. 6, 2018), *report and recommendation adopted sub nom. Sierra v. Berryhill*, 2019 WL 1259168 (S.D.N.Y. Mar. 19, 2019). *See also Horace ex rel. J.J.J. v. Colvin*, 2015 WL 1924992, at *13 (W.D.N.Y. Apr. 28, 2015) (remanding because the ALJ's "heavy reliance" on the opinion of the

non-examining state agency review psychologist, based on the "incomplete record" adduced 16 months before the hearing, was "erroneous").

Compounding the difficulty in this case is the lack of underlying psychiatric treatment notes, either from plaintiff's original psychiatrist, Dr. Miah (who, as noted above, never responded to the SSA's requests for records) or from Dr. Gonzales himself. Where, as here, the ALJ cannot independently assess the degree to which the various medical opinions before her are supported or contradicted by plaintiff's mental health treatment records, she should exercise extreme caution, and articulate sound reasons, before crediting the opinion of the one source who never laid eyes on the plaintiff over the opinions of every doctor who personally examined him. *See Fontanez v. Colvin*, 2017 WL 4334127, at *21-22 (E.D.N.Y. Sept. 28, 2017) (collecting cases and remanding where ALJ improperly relied on opinion of non-treating, non-examining expert, "based on an admittedly incomplete record," to determine plaintiff's mental RFC). ALJ Parkhurst, however, took the opposite approach, requiring remand.

### b.      Dr. Marini, Dr. Themistocle, and Dr. Revan

In evaluating the plaintiff's physical limitations, the ALJ once again rejected the views of plaintiff's treating physicians, assigning "little" and "no" weight, respectively, to the opinions of pain management physicians Dr. Marini and Dr. Themistocle, both of whom concluded that plaintiff had functional limitations that would have precluded work at the light exertional level. (R. 18.) Moreover, the ALJ failed to even mention the opinion of consultative internist Dr. Revan – who found that plaintiff had "mild to moderate" limitations "with upper extremities for gross motor activity" (R. 651) – much less incorporate any upper extremity limitations into her physical RFC.

In discounting Dr. Marini's 2014 assessment, the ALJ described it as "inconsistent with the clinical findings," noting that "the newer evidence shows only mild radiculopathy and his physicians do not restrict his activities, except with regard to heavy lifting." (R. 18.) In addition, the ALJ found that:

> Upon examination in 2014, the claimant exhibited no more than mild to moderate limitations in exertional activities. (Ex. 9F). His physicians recommend conservative treatment, primarily in the form of pain management and physical therapy. (Ex. 4F/7F/9F). The claimant experiences pain, but he is capable of completing his personal care. He walks, but he takes pain medication for his chronic pain. The treatment provided and the clinical findings are inconsistent with Dr. Marini's assessment that the claimant has severe limitations.

(R. 18.) The 2014 examination that the ALJ referred to (at Exhibit 9F in the administrative record) was the consultative exam performed by Dr. Revan. As noted above, Dr. Revan wrote that plaintiff had "mild to moderate limitations with upper extremities for gross motor activity." She also assessed "[m]ild limitations with walking due to back pain and sitting, standing, and lying down due to neck and back pain" and "moderate limitations in activities of daily living secondary to neck and back pain." (R. 651.) However, other than citing her opinion as a reason to discount Dr. Marini's, the ALJ did not otherwise mention Dr. Revan and did not assign any weight to her opinion, in violation of 20 C.F.R. § 416.927(c) (2012) ("we will evaluate every medical opinion we receive").

The ALJ's failure to discuss Dr. Revan's opinion is problematic, not only because she ignored the upper extremity limitations discussed therein, but also because she seemingly accepted – and based her physical RFC on – the portion of Dr. Revan's opinion finding only "mild limitations" in plaintiff's ability to sit, stand, and walk for sustained periods of time. An ALJ is free to accept some portions of a medical opinion and reject others; however, she may not do so *sub silientio.* "It is beyond dispute that an ALJ who chooses to adopt only portions of a medical

opinion must explain his or her decision to reject the remaining portions." *Maenza v. Colvin*, 2016 WL 1247210, at \*12 (W.D.N.Y. Mar. 24, 2016) (citations and quotation marks omitted); *see also Ramirez v. Comm'r of Soc. Sec.*, 2018 WL 1371161, at \*12 (S.D.N.Y. Mar. 1, 2018) ("absent sufficient explanation, the ALJ may not selectively credit only the portions of a treating physician's opinion that support his determination while discounting other portions") (internal quotation marks and citations omitted), *report and recommendation adopted*, 2018 WL 1374262 (S.D.N.Y. Mar. 16, 2018), *appeal dismissed sub nom. Ramirez v. Comm'r of Soc. Sec. Admin.*, 2018 WL 6982351 (2d Cir. Nov. 29, 2018).

The ALJ's reliance on the fact that plaintiff's doctors generally recommended "conservative treatment," which she cites as a reason for discounting Dr. Marini's opinion, is also problematic. It is well-settled, in this Circuit, that "the opinion of a treating physician may not be 'discounted merely because he has recommended a conservative treatment regimen.'" *Conyers v. Comm'r of Soc. Sec.*, 2019 WL 1122952, at \*18 (S.D.N.Y. Mar. 12, 2019) (quoting *Burgess*, 537 F.3d at 129); *see also Shaw v. Chater*, 221 F.3d 126, 134-35 (2d Cir. 2000) (reversing decision denying benefits where the ALJ improperly "imposed [his] notion that the severity of a physical impairment directly correlates with the intrusiveness of the medical treatment ordered"); *Owens v. Berryhill*, 2018 WL 1865917, at \*6 (E.D.N.Y. Apr. 18, 2018) (collecting cases). Moreover, the fact that plaintiff "is capable of completing his personal care" and "walks" (assisted by pain medication) is not a "good reason" to discount Dr. Marini's assessment of significant work-related functional limitations. *See McCleese v. Saul*, 2019 WL 3037308, at \*12 (S.D.N.Y. June 26, 2019) ("[Plaintiff]'s ability to engage in certain daily activities on a limited basis is not inconsistent with the limitations described by [his treating physician]."), *report and recommendation adopted sub nom. McCleese v. Berryhill*, 2019 WL 3034892 (S.D.N.Y. July 11, 2019); *Cabrera v. Berryhill*,

2017 WL 3172964, at *12 (S.D.N.Y. July 25, 2017) (plaintiff's ability to perform some daily activities does not necessarily conflict with the treating physician's opinions regarding his functional limitations in an eight-hour competitive work environment), *report and recommendation adopted sub nom. Cabrera v. Comm'r of Soc. Sec.*, 2017 WL 3686760 (S.D.N.Y. Aug. 25, 2017).

The ALJ also erred in giving zero weight to the only up-to-date physical assessment in the administrative record – the 2016 medical source statement of treating physician Dr. Themistocle – because "it is inconsistent with the treatment notes" and "inherently inconsistent." (R. 18.) The ALJ acknowledges that Dr. Themistocle's opinion is supported by certain clinical signs, such as limited ranges of motion, an antalgic gait, and bilateral positive straight leg raising tests, but rejects it in large part because "his physicians recommend conservative treatment." (*Id.*) As discussed above, this was error. Moreover, Dr. Themistocle's findings that plaintiff can travel without a companion, shop, walk at a reasonable pace, and use public transportation are not "inherently inconsistent" with his opinion that he cannot continuously sit, stand, or walk for more than 25 minutes "at one time without interruption." (R. 699.) *See McCleese*, 2019 WL 3037308, at *12; *Cabrera*, 2017 WL 3172964, at *12.

### c.    The ALJ Should Evaluate Additional Evidence on Remand

Although the documents submitted to the Appeals Council after the ALJ's decision were not part of the record on which the ALJ based her Decision, "they are now part of the record and should be considered on remand." *See Mercado v. Colvin*, 2016 U.S. Dist. LEXIS 91059, at *67 n.47 (S.D.N.Y. July 13, 2016) (citing *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)); *accord Craig v. Comm'r of Soc. Sec.*, 218 F. Supp. 3d 249, 269 (S.D.N.Y. 2016). "Of course, '[t]he Commissioner remains free to direct such further medical examination and analysis as may be

appropriate.'" *Murphy v. Berryhill*, 2019 WL 1075605, at \*8 (E.D.N.Y. Mar. 7, 2019) (quoting *Tarsia v. Astrue*, 418 F. App'x 16, 19 (2d Cir. 2011) (summary order)). The ALJ must, however, assess the proper weight for each of the medical opinions in the record and reconsider plaintiff's RFC.

## VI.    CONCLUSION

For the reasons stated above, plaintiff's motion is GRANTED, the Commissioner's motion is DENIED, and this action is REMANDED for further proceedings consistent with this Opinion an Order. On remand, the ALJ should review the medical and non-medical evidence in the record, including any new evidence developed for or at new hearings, re-weigh the opinion evidence, and provide an adequate roadmap for her reasoning. In addition, if the ALJ takes testimony from a vocational expert she should put one or more complete and intelligible hypotheticals to that VE, incorporating all of the claimant's limitations. *See Pritchard v. Colvin*, 2014 WL 3534987, at \*10 (N.D.N.Y. July 17, 2014) ("If a hypothetical question does not include all of a claimant's impairments, limitations and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability.").

Dated:  New York, New York
        September 25, 2019

**SO ORDERED**.

**BARBARA MOSES**
**United States Magistrate Judge**